UNITED STATES of America

v.

LeRoy WILEY, Defendant.

No. 57 CR 692.

United States District Court
N. D. Illinois, E. D.

July 1, 1960.

See also 267 F.2d 453; 278 F.2d 500.

R. Tieken, U. S. Atty., John Grady, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

R. Eugene Pincham, Charles B. Evins, Chicago, Ill., for defendant.

CAMPBELL, Chief Judge.

There have been countless studies made, and articles written, about the various considerations, such as reformation, deterrence and retribution, which motivate a criminal sentence. There are no rigid rules, no formulas and each case stands on its own particular facts as they are evaluated by the trial judge who is assisted only by general principles and his own conscience. I am sure that I speak for my many colleagues when I state that the imposition of a criminal sentence is the most delicate, difficult and distasteful task for the trial judge.

In the cause before me, after defendant's conviction on Count II of an indictment charging him and four other defendants with unlawfully, willfully, knowingly and feloniously having in their possession certain goods, unlawfully stolen while moving in an interstate shipment and known by them to have been stolen in violation of Title 18 U.S.C. Section 659, I sentenced defendant, after full consideration of all the evidence introduced during his trial, as well as the reports of the government investigators, to imprisonment for a period of three years. After full consideration of the reports of the government investigators, I sentenced the other four defendants, who had previously pled guilty as fol-

lows: Ulysses McGhee, 2 years; Joseph Helen, 1 year and 1 day; Joseph M. Kelley, 1 year and 1 day; and Roman Jackson, 1 year and 1 day. McGhee had four prior felony convictions and was more or less the ringleader insofar as the actual stealing operations of this particular gang were concerned. Helen, Kelley and Jackson likewise had records of prior convictions.

Defendant Wiley, prior to the imposition of sentence moved for a presentence investigation after which the following colloquy took place:

"The Court: No, I ordinarily don't do that when I hear the evidence in the case. I ordinarily do where there is no prior record. Where the defendant stands trial it is well-known in this Court I proceed to sentence immediately after the trial. I will hear anything you care to say as to his family situation and his background and his prior history."

(Thereupon, defendant testified as to his residence, marriage, family, employment and that he had never served any time in any penal institution.)

"The Court: Any questions of the defendant?

"Mr. Grady: No.

"The Court: Is there anything you want to say before the imposition of sentence?

"Mr. Evins: (Defendant's counsel) Yes, Judge. I would like to say this, that you have offered here in mitigation and in view of the fact that this defendant has no previous record of any kind and that in view of the further fact that he is married and he has a family and he is living with his wife, supporting his family, and he has a good job out of which he is supporting his family, I feel that justice could be served in this case if the Court sees fit to put him on probation for a period of time, and I am asking the Court to show him some leniency

and consideration because of those facts, because of his family and because of the fact he just got a newborn baby and as I understand it, he is the main and only support of that family.

"I am asking the Court at this time if he wouldn't consider granting probation.

"The Court: Those are the facts the defendant should have considered prior to committing the offense.

\*     \*     \*     \*     \*

"The Court: In view of the fact that the trial was expedited by waiving a jury and by stipulation of the various items that expedited the proof I make the sentence less than I otherwise would. *It is, however a serious crime, and it is a case for the imposition of a sentence, either on a plea of guilty or on a trial.* Had there been a plea of guilty in this case probably probation might have been *considered* under certain terms, but you are all well aware of the standing policy here that once a defendant stands trial that element of grace is removed from the consideration of the Court in the imposition of sentence.

"Taking into consideration the various factors that you have referred to—and that I have referred to, I make the sentence less than I otherwise would, but a sentence must be imposed.

"On the judgment of guilty heretofore, rendered the defendant is sentenced to the custody of the Attorney General of the United States to be incarcerated in a penitentiary of the United States for a term of three years." (Emphasis supplied.)

Upon appeal, the judgment insofar as it adjudged defendant guilty was affirmed though the cause was remanded, Chief Judge Hastings dissenting, for consideration of defendant's application for probation because, as the Court stated, of my "standing policy" to the effect that "that element of grace is removed

from the consideration of the court" once a defendant stands trial. United States v. Wiley, 7 Cir., 267 F.2d 453, 455, 456.

When the mandate was filed, I proceeded to hearing on the motion of Wiley for probation and after full consideration of all the factors before me I reimposed the sentence of imprisonment for a period of three years.

Upon further appeal, the sentence was set aside and the cause remanded with directions because, as the Court of Appeals stated:

"(t)he district court has, without any justification, arbitrarily singled out a minor defendant for the imposition of a more severe sentence than that imposed upon the co-defendants * * *" United States v. Wiley, 7 Cir., 278 F.2d 500, 503.

The cause is now before me pursuant to this mandate.

The maximum penalty for violation of Title 18 U.S.C. Section 659 is imprisonment for a period of ten years together with a fine of $5,000. Any sentence within this limit is, of course, discretionary with the trial judge. It has now been determined by the Court of Appeals that I have abused this discretion by imposing a three years' sentence on Wiley. This determination by the Court of Appeals is apparently based upon a comparison of the sentences imposed upon the several defendants in this cause; my statements regarding probation for a defendant who has exercised his constitutional right of trial; my statement of November 7, 1958 where, during an unrelated hearing upon the motion of McGhee to vacate an order setting his appeal bond, I described Wiley as "a minor participant"; and finally, a comparison of the criminal records and general background of each of the defendants as revealed in the record before the Court of Appeals.

Prior to these two Wiley decisions by the Court of Appeals, there were serious doubts as to whether or not appellate review of a trial judge's discretion under the Federal Probation Act, 18 U.S.C. § 3651 et seq. or his discretion to determine a criminal sentence was in fact possible. With regard to the Federal Probation Act, Chief Justice Hughes, in Burns v. United States, 287 U.S. 216 stated at page 220, 53 S.Ct. 154, at page 155, 77 L.Ed. 266:

"The Federal Probation Act * * * confers an authority commensurate with its object. It was designed to provide a period of *grace* in order to aid the rehabilitation of a penitent offender; to take advantage of an opportunity for reformation which actual service of the suspended sentence might make less probable. * * * *Probation is thus conferred as a privilege and cannot be demanded as a right. It is a matter of favor, not of contract. There is no requirement that it must be granted on a specified showing. The defendant stands convicted; he faces punishment, and cannot insist on terms or strike a bargain.* To accomplish the purpose of the statute, an exceptional degree of flexibility in administration is essential. It is necessary to individualize each case, to give that careful, humane, and comprehensive consideration to the particular situation of each offender which would be possible only in the exercise of a broad discretion. The provisions of the act are adapted to this end." (Emphasis supplied.)

Though the Court of Appeals has cited LaBuy v. Howes Leather Company, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 and Yates v. United States, 356 U.S. 363, 78 S.Ct. 766, 2 L.Ed.2d 837 in support of its assumed power to review sentencing, I should like to point out respectfully that these decisions have been generally interpreted as advocating purely *administrative* supervision and not review of sentencing despite the fact that Yates, because it involved criminal contempt, an integral part of court procedure, could be erroneously interpreted as advocating review of sentencing. I think this is borne out by the fact that subsequent to these decisions the Supreme

Court stated in Gore v. United States, 357 U.S. 386, at page 393, 78 S.Ct. 1280, at page 1285, 2 L.Ed.2d 1405:

"In effect, we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility * * * these are peculiarly questions of legislative policy. Equally so are the much mooted problems relating to the power of the judiciary to review sentences. First the English and then the Scottish Courts of Criminal Appeal were given power to revise sentences, the power to increase as well as the power to reduce them * * *. *This Court has no such power.*"

However, since our Court of Appeals has now determined that appellate review of a judge's discretion with regard to probation and sentencing does exist, this question has been resolved and I am so bound.

In addition to this question, heretofore unresolved, there was and is another reason why, though there has been a great deal of discussion and debate about appellate review of sentencing, and though England and some of our states have invoked varying systems of review, there has been no great movement in the federal system to review sentencing. I believe that reviewing courts have recognized many of the practical problems involved, a few of which are clearly exemplified by the effect the Wiley decisions will have upon the present administration of the Federal Probation Act. First, I believe these decisions will have a coercive effect on the use of presentence investigation and consideration for probation even in cases where this privilege should clearly be denied. This is a waste of valuable time, effort and money. Second, the information contained in the reports of government investigators, which is not in the record, is highly confidential since otherwise it would be impossible for government investigators to continue certain investigations or gain

confidential information about a defendant. If the trial judge is in part motivated by the reports of the government investigators in denying probation in a given case, he cannot in good conscience divulge this information and yet, risks having the cause remanded because of appellate review of the record. Third, there is likewise the danger that the secrecy of the presentence investigation will also yield to the pressure of appellate review and this, I need not add, would undermine seriously, the Federal Probation Act since it would become nearly impossible to secure confidential information about a defendant. Fourth, there have already been a number of frivolous appeals based upon the denial of consideration of probation or probation and I feel that now that the floodgates have been opened, there will be many more. Fifth, our already overworked appellate courts will be unable to bear the heavy burden that review of discretion under the Federal Probation Act entails.

These practical problems which impede a proper appellate review of a trial judge's discretion under the Federal Probation Act, are by analogy, the same, and in my opinion, more pronounced under our system of appellate review now that it has been determined that appellate courts can review the discretion of a trial judge in his determination of a criminal sentence.

Finally, there is one other important reason why appellate courts have refused to review the discretion of a trial judge with regard to probation and sentencing. Those factors which motivate the trial judge in either granting or denying probation, or which motivate a sentence are, for the most part, difficult to determine by a reviewing court because of their obvious subjective qualities. A reviewing court cannot say with any degree of certainty what motivated the trial judge in his determination that probation should be refused or a particular sentence imposed. The trial judge may have been influenced by factors contained in the reports of government investigators or the presentence investi-

gation report which are not set forth in the record and which are not before the reviewing court. It is generally accepted that these factors should be considered carefully in the determination of a criminal sentence, Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337. A reviewing court also does not have the opportunity to observe the defendant or his witnesses which may in part, motivate the trial judge especially where rehabilitation is concerned. In other words, a court reviewing the discretion of a trial judge with regard to probation or sentencing is limited to those factors which appear of record or to statements made by the trial judge with regard to his consideration of probation or his determination of a sentence which can easily be misconstrued or misinterpreted. In short, it is generally recognized that under our present system of appellate review, it is impossible to intelligently, or correctly review sentencing. I sincerely believe that these defects in appellate review of sentencing to which I have referred, are to some degree exemplified in the cause before me now.

Generally speaking, the same factors that prompted the determination of the Court of Appeals that I have abused my discretion under the Federal Probation Act, also prompted the determination that I have abused my sentencing discretion.

I should first like to discuss my statement that it is my "standing policy" not to consider probation where a defendant has exercised his constitutional right to trial. I cannot agree with the construction placed upon this statement by the Court of Appeals for several reasons. While this statement is of course immediately relevant to the question of whether or not it was an abuse of discretion on my part to deny Wiley's application for consideration of probation, it is irrelevant to the actual sentence imposed upon Wiley except as it is subject to the deduction that if a defendant does stand trial in my Court and is found guilty, he will not ordinarily be afforded the same leniency he would have received if he had pled guilty.

■ I readily admit the truth of this deduction. I think that almost any trial judge in the United States will take into consideration a plea of guilty when imposing sentence and, in fact, most judges usually state for the record words to the effect that "since the defendant has saved the government the time and expense of trial, the sentence is less than it ordinarily would be." What is deducted from my statement is merely the reverse side of the coin and is subject to the same justification.

As Justice Lummus of the Supreme Judicial Court of Massachusetts has pointed out in his book, "The Trial Judge" at pages 46–47:

"If all the defendants should combine to refuse to plead guilty, and should dare to hold out, they could break down the administration of criminal justice in any state in the Union. But they dare not hold out, for such as were tried and convicted could hope for no lieniency. The prosecutor is like a man armed with a revolver who is cornered by a mob. A concerted rush would overwhelm him, but each individual in the mob fears that he might be one of those shot during the rush. When defendants plead guilty, they expect more leniency than when convicted by a jury, and must receive it, or there will be no such pleas. The truth is, that a criminal court can operate only by inducing the great mass of actually guilty defendants to plead guilty, paying in leniency the price for the plea.

"This, I agree, is a stark reality, not the ideal. In an ideal judicial system, leniency would be a free gift from the sovereign people to an erring citizen. The criminal would have no voice in the decision, much less barter for it with his sovereign. But courts are not free, and never have been free, from the pressure in favor of criminals that the very volume of criminal business exerts.

The defenders of criminals know this perfectly. It is their principal asset. The actual trial of criminal cases is only a small part of the work of a criminal lawyer. Since his clients are usually guilty, and a good part of them would be found guilty by a jury, he seeks to turn to their advantage some defect in the machinery of public justice."

Besides the need for exchanging some degree of leniency in return for a plea of guilty because, as Justice Lummus indicates, of our overwhelming volume of criminal cases, I should also like to point out as an additional reason, the great saving of expense and time to the government that is possible and that is achieved by properly inducing defendants to plead guilty. For example, in the cause before me, the official total cost to the government for the complete investigation up to the time of sentencing was $11,250. The Assistant United States Attorney, upon representation spent three days in preparation for Wiley's trial and one day on trial. Several investigators likewise spent three days in preparation for trial and one day at the trial. I myself spent one half day in preparation for trial and then one day on trial and accordingly the Court was totally occupied for a day and a half. Though the expense and time that would have been saved the government if Wiley had pled guilty is fairly obvious, I suggest that, if this had been a criminal trial lasting weeks or months as many of our trials actually do, then the saving of time and expense to the government would have been far more striking.

Finally, there is one more reason for affording some degree of leniency in exchange for a plea of guilty. One of the principal considerations in the imposition of a criminal sentence is reformation. Where, as here, the defendant first pleads guilty and then, with the permission of the Court, withdraws his plea of guilty, enters a plea of not guilty and exercises his constitutional right to trial despite the fact that the evidence of his guilt is overwhelming, I find it difficult to believe that the defendant is actually repentant and seriously concerned with rehabilitation which is generally true when a defendant pleads guilty.

For these reasons, I believe, and it is generally accepted by trial judges throughout the United States, that it is entirely proper and logical to grant some defendants some degree of leniency in exchange for pleas of guilty. If then, a trial judge grants leniency in exchange for a plea of guilty, it follows, as the reverse side of the same coin, that he must necessarily forego leniency, generally speaking, where the defendant stands trial and is found guilty. This is especially true where there are several co-defendants indicted for the same offense and some plead guilty while others stand trial and are found guilty. In such a case, again generally speaking, the trial judge should grant leniency to those who plead guilty and refuse leniency to those who choose to stand trial. Usually, the result is, as would be expected, a disparity in the sentences imposed on the various defendants. However, it is incorrect, in my opinion, to say, as the Court of Appeals has termed my sentence of Wiley, that a "more severe sentence" is imposed on a defendant who stands trial. Rather, it seems more correct to me to say that the defendant who stands trial is sentenced without leniency according to law.

When I referred to my "standing policy", I meant nothing more than that which is already established for the reasons stated above, as a valid principle of sentencing. In addition to these reasons, I should also like to point out that throughout the United States there were a total of 35,517 defendants in criminal proceedings commenced during the fiscal year 1959. Since each of these defendants must be dealt with by one of the 248 district judges in the United States with the great majority of defendants falling within the jurisdiction of the greater metropolitan districts such as the Northern District of Illinois, it is perhaps easier to understand why, in ac-

686

cord with the thinking of Justice Lummus, I might make general reference to a "standing policy" not to consider probation where a defendant stands trial even though I do not in fact strictly adhere to such a policy. However, if in one year, 248 judges are to deal with 35,517 defendants, the district courts must encourage pleas of guilty. One way to encourage pleas of guilty is to establish or announce a policy that, in the ordinary case, leniency will not be granted to a defendant who stands trial.

One way of extending such leniency is under the Federal Probation Act and therefore, it follows that if, in the ordinary case, a defendant stands trial, he might not be granted the leniency afforded by the Federal Probation Act. For this reason, I stated that it is my "standing policy" to remove "that element of grace" when a defendant stands trial. It is not a strict, rigid policy and I do not apply it as such since, as my record amply demonstrates, I have on numerous occasions granted probation despite the fact that the defendant has exercised his constitutional right to trial. However, it does stand as a warning to all criminal defendants to consider well that they may not be granted leniency in my court, or consequently probation, if they choose to stand trial and are found guilty. I firmly believe that this "standing policy" does not in any way conflict with our present day philosophical concept of sentencing as it has developed historically or with the purpose of the Federal Probation Act as set forth by Chief Justice Hughes in Burns v. United States, supra.

■ It is true that my denial of Wiley's application for probation, as well as the three year sentence I imposed upon him were, for the reasons here given, in my opinion, rightfully motivated in part by the fact that he stood trial. However, there were other factors present in this cause, though not in the record, which I considered and which also, in part, motivated my denial of his application for probation and his sentence. That is why, when denying Wiley's application for probation I stated, as Chief Judge Hastings pointed out, dissenting, that this was "a serious crime, and it is a case for the imposition of a sentence, either on a plea of guilty or on a trial." [267 F.2d 458]

For example, the Court of Appeals found that Wiley's criminal record was not so "serious" as that of his co-defendants. It is true that on its face his criminal record does not compare equally to the criminal records of his co-defendants McGhee and Helen, though it is comparable to the criminal records of Jackson and Kelley. He was arrested in December of 1956 on a charge of receiving stolen property and placed on probation for a period of six months and also has been arrested several times for gambling. However, there is ample evidence in the reports of the government investigators, which are not a part of this record, but which I thoroughly considered before the imposition of sentence, that Wiley was involved in a similar offense, the burglary of the Chicago Terminal of Super Service Motor Freight Company on October 15, 1957 for which he was not indicted because of the pendency of the cause now before me. I think it is clear from the reports of the government investigators that Wiley perjured himself when he testified that he had never helped to dispose of any other stolen merchandise.

I should like now to refer to another factor I considered in sentencing Wiley which is covered fully in the reports of the government investigators though only hinted at in the record. Wiley has a political position with the City of Chicago, Bureau of Sanitation. His foreman at the time these offenses here mentioned were committed, was a man named Charles B. Vaughn. There is evidence in the reports of the government investigators which shows that Vaughn was the actual immediate contact for a number of "fences" for stolen property and that it was Vaughn who actually made the deliveries to these several "fences" after taking over the movement of a load from someone who had stolen merchandise, such as, in the present cause, Mc-

Ghee. It is clear from the reports of the government investigators that it was Wiley who had originally put McGhee in contact with Vaughn, as a man who would dispose of stolen merchandise. It is also clear from the reports that Vaughn was an associate of individuals known to be members of the organized crime syndicate in Chicago. Thus, Wiley was a "chaser" for Vaughn and actually induced the commission of crimes such as these, since he, in the first instance provided the means of disposal for stolen merchandise to men like McGhee, Helen, Kelley and Jackson.

I cannot say with certainty that this crime would never have occurred if Wiley had not put McGhee in contact with Vaughn, but certainly, his part as a "chaser" is an important factor to be considered, especially, where as here, there are strong overtones of organized crime and political influence.

Since the "fencing" operation of Vaughn appeared to be on rather a large scale and since government investigators were in the midst of their investigation of Vaughn and his various outlets for the disposal of stolen merchandise, it was impossible for me to describe for the record, Wiley's major part in the operations of Vaughn at the time I was dealing with Wiley. I feel that I can now in good conscience reveal the Wiley-Vaughn operation because just recently, shortly after the release of the latest decision of the Court of Appeals in United States v. Wiley, supra, Charles B. Vaughn was brutally murdered.

When I described Wiley as a "minor participant" in this crime some weeks subsequent to the time I imposed sentence upon him, it was at a hearing upon a motion of McGhee to vacate an order setting his appeal bond. I was at this time particularly concerned with McGhee who was, as I stated "somewhat of a ringleader" insofar as the actual stealing operations of McGhee, Kelley, Jackson and Helen were concerned. Without question, Wiley was a "minor participant" in regard to the actual theft by these defendants but he was a major participant in the operation of Vaughn which was not reported in the record of this cause and which, for reasons of confidence, I could not refer to. Furthermore, since I was only concerned with McGhee at this time, it does not seem logical to me to refer to my out of context statements about Wiley to determine that the sentence I imposed upon him several weeks prior was arbitrary and "without justification".

In sentencing Wiley, I seriously considered his prospects for rehabilitation. When he originally changed his plea from guilty to not guilty, there was no remorse in this man. McGhee, Kelley, Jackson, and Helen pled guilty and did stand conscience-stricken in repentance before the Court. Wiley did not cooperate with the government investigators. McGhee, Kelley, Jackson and Helen gave them their full cooperation and, I might here add, that this is especially true of McGhee. Wiley's demeanor during all of these proceedings does not indicate repentance nor am I impressed by the testimony of his aunt or the Reverend Davis since the total effect of everything said leaves little doubt in my mind that Wiley was, is, and will remain, far removed from their guidance. Despite their records, I see McGhee, Kelley, Helen and Jackson as men who can be helped. They are not particularly bright men or men of strong, moral character and this has, in part, led to their downfall because they are always subject to the temptations presented by men like Wiley. These men can be helped because they have indicated that they want to be helped. Wiley, on the other hand, does not want to be helped. He is, by all outward manifestations, the self-assured "smart guy". From what I have learned about Wiley, I am convinced that he is not only contemptuous of law and order and those people who attempt to live their lives according to law and the moral standards of the community, but he is also contemptuous of men like McGhee, Kelley, Helen and Jackson who are not as "smart" as he thinks he is. Wiley, I feel will go back to his underworld

friends without remorse and will continue to infect and disease our society.

In short, as far as I am motivated by reformation in my sentences of these co-defendants, I feel that McGhee, Kelley, Jackson and Helen have greater prospects of rehabilitation than Wiley.

Deterrence also motivated the sentence I imposed upon Wiley. First, Wiley induced the commission of crimes by "chasing" for Vaughn. It is my opinion that deterrence best serves the interest of society when it is used effectively against "fences", men like Vaughn or their "chasers" such as Wiley because these men are far more responsible for most burglaries than the men like McGhee, Kelley, Jackson and Helen who actually perform the act. Like many other trial judges I believe that if "fences" are eliminated, crime will be effectively reduced and to this end, I advocate deterrence as a greater motivating factor in the sentence of a man like Wiley than I would in the case of McGhee, Kelley, Jackson or Helen. Furthermore, Wiley is an employee of the City of Chicago and therefore represents the people of Chicago. I feel in the instant cause, for these and other reasons, that deterrence is far more important as a sentencing factor in the case of Wiley rather than in the case of any of the other co-defendants.

Though during my entire twenty years as a Federal Judge I have never been motivated in any criminal sentence to any great degree by a consideration of retribution, I again suggest that Wiley as an employee of the City of Chicago is far more vulnerable to this particular philosophy of sentencing then any of the other co-defendants.

I of course take no issue with the Court of Appeals. It has acted with apparent justification to correct what it feels to be an unjust sentence. With great respect, I do feel however, for the reasons stated herein, that until provision is made in law for appellate review of a trial judge's discretion under the Federal Probation Act and his discretion to determine a criminal sentence, based upon all the factors considered by the trial judge, it is an uncertain and dangerous precedent that is now advanced by the Seventh Circuit Court of Appeals in the two Wiley decisions.

In good conscience and with due regard to my oath of office I cannot conclude that any sentence less than three years is either just or proper in the case of Wiley now before me. Accordingly, I hereby now again reimpose my original sentence of three years. However, out of my deep respect for the Court of Appeals, and in obedience to its mandate, I also hereby suspend the execution of the said sentence.

The defendant Wiley may go hence without day.